**WESTLANDS WATER DISTRICT; San Benito County Water District, Plaintiffs–Appellants,**

v.

**FIREBAUGH CANAL, Firebaugh Canal Water District; Central California Irrigation District; Columbia Canal Co.; San Luis Canal Co.; Friant Power Authority; Friant Water Users Authority; City of Fresno; Madera Irrigation District; Stone Corral Irrigation District; Florencio Ming–Ming; Ronald Davis, Intervenors–Appellees,**

**United States of America, Defendant–Appellee.**

No. 93–15295.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 1, 1993.

Decided Nov. 30, 1993.

Thomas W. Birmingham, Kronick, Moskovitz, Tiedemann & Girard, Sacramento, CA, for plaintiffs-appellants.

Robert L. Klarquist, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, for defendant-appellee.

Gregory K. Wilkinson, Best, Best & Krieger, Riverside, CA, Paul R. Minasian, Oroville, CA, for intervenors-appellees.

Before: REAVLEY,* PREGERSON and FERNANDEZ, Circuit Judges.

REAVLEY, Circuit Judge:

Westlands Water District (Westlands) and San Benito County Water District (San Benito) appeal a district court order dismissing their claims against the Department of Interior's Bureau of Reclamation (Bureau), arising out of water allocations made by the Bureau during the 1992 California drought. While we do not find ourselves in complete agreement with all of the district court's analysis, we affirm the judgment.

## BACKGROUND

The Central Valley Project (CVP) is a massive water reclamation project authorized by various acts of Congress, and serving the needs of central California. Prior to the construction of the Friant Dam across the San Joaquin River, an early CVP project, the Bureau entered into contracts with holders of downstream water rights. The first such contract, known as the Exchange Contract, was signed in 1939. The currently effective second amended Exchange Contract was executed in 1968, by the Bureau and four Exchange contractors,[1] all of whom are parties or successors in interest to the original Exchange Contract. Under the terms of the Exchange Contract, the Exchange contractors gave up their rights to San Joaquin waters in exchange for the agreement of the Bureau to provide "substitute water." Article 5 of the Exchange Contract "anticipated that most if not all of the substitute water provided the [Exchange contractors] will be delivered to them via the [ ] Delta–Mendota Canal." The Delta–Mendota canal carries water from the Sacramento–San Joaquin River Delta (the Delta). Article 4 of the Exchange Contract obliged the Bureau to release water from Millerton Lake, the lake created behind Friant Dam, in the event of temporary or permanent interruptions in the delivery of substitute water to the Exchange contractors.

The CVP is divided into a number of units. The San Luis Unit was authorized by the San Luis Act of 1960, Pub.L. No. 86–488, 74 Stat. 156 (1960) (the Act). The San Luis Unit consists of the San Luis Dam and the San Luis Reservoir (the Reservoir), together with a number of smaller facilities. The Reservoir stores surplus water from the Delta, which is pumped into the Reservoir from the Delta–Mendota Canal. The Reservoir was constructed to provide irrigation water for Merced, Fresno and Kings Counties. *Id.* at § 1(a). The Act further contemplated additional construction projects to provide CVP water to Santa Clara, San Benito, Santa Cruz and Monterey Counties. *Id.* at § 6. The San Felipe Division of the CVP was later created to serve these counties. To implement the Act, the Bureau entered into contracts with water service providers, including appellants Westlands and San Benito (collectively the San Luis Contractors). The Westlands contract was executed in 1963, and the San Benito contract was executed in 1978.

On February 14, 1992, after several years of serious drought, the Bureau issued a declaration of available CVP water supplies for water year 1992. The declaration stated the Bureau's intent to provide no CVP water to

---

* Honorable Thomas M. Reavley, Senior United States Circuit Judge for the United States Court of Appeals, Fifth Circuit, sitting by designation.

1. The four Exchange contractors are the Central California Irrigation District, the Columbia Canal Company, the San Luis Canal Company, and the Firebaugh Canal Water District.

certain agricultural contractors, including the San Luis Contractors, while the Exchange contractors were to receive 75 percent of their normal supply of water. The declaration was revised to allow for 15 and then 25 percent of normal allocations to the San Luis Contractors. The Bureau planned to divert Reservoir water to meet its contractual obligations to the Exchange contractors.

On March 20, 1992, the San Luis Contractors, believing that they are entitled to preferential access to water from the San Luis Reservoir, sued the Bureau and its regional director. The San Luis Contractors alleged in their complaint that the Bureau's intended diversion of Reservoir water to serve the needs of the Exchange contractors was contrary to the obligation in the Exchange Contract to release water from Millerton Lake in the event of an inability to provide substitute water. They further alleged that the intended diversion of Reservoir water to the Exchange contractors violated the Act and the Westlands and San Benito contracts. Relief was sought under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, and federal reclamation law. The San Luis Contractors prayed for an injunction "prohibiting the Bureau from rediverting water stored in San Luis Reservoir to satisfy its contractual obligations to the Exchange contractors," and "a declaration that Plaintiffs have prior rights to the water stored in the San Luis Reservoir pursuant to the terms of the San Luis Act·and contracts entered into thereunder and that the Bureau may not satisfy its obligations to the Exchange contractors through rediversion of project water from storage in San Luis Reservoir."

The Exchange contractors and several users of water from Millerton Lake intervened in support of the Bureau. The Bureau filed a motion to dismiss under Fed.R.Civ.P. 12(b)(6). The intervenors moved for judgment on the pleadings under Fed.R.Civ.P. 12(c). The district court considered the motions together, granted them, and dismissed the suit without leave to amend. *Westlands Water Dist. v. Dept. of Interior,* 805 F.Supp. 1503 (E.D.Cal.1992).

## DISCUSSION

 We review *de novo* rulings on Rule 12(b) motions to dismiss for failure to state a claim and Rule 12(c) motions for judgment on the pleadings. *Assiniboine and Sioux Tribes v. Bd. of Oil and Gas Conservation,* 792 F.2d 782, 794 (9th Cir.1986) (motion to dismiss); *3550 Stevens Creek Assoc. v. Barclays Bank,* 915 F.2d 1355, 1357 (9th Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991) (motion for judgment on the pleadings). In deciding a motion to dismiss, the district court must accept as true all material allegations in the complaint and construe them in the light most favorable to the plaintiff. *NL Indus., Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir. 1986). Similarly, a judgment on the pleadings is appropriate when, even if all allegations in the complaint are true, the moving party is entitled to judgment as a matter of law. *Hal Roach Studios v. Richard Feiner & Co.,* 896 F.2d 1542, 1550 (9th Cir.1990).

### A. *Statutory Claims*

The APA provides a remedy for agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right...." 5 U.S.C. § 706. The San Luis Contractors contend that diverting Reservoir water to serve the needs of the Exchange contractors is remediable under the APA since such action violates the San Luis Act. Specifically, they claim that such action would violate § 1(a) of the Act, which provides:

> For the principal purpose of furnishing water for the irrigation of approximately five hundred thousand acres of land in Merced, Fresno, and Kings Counties, California, hereinafter referred to as the Federal San Luis unit service area, and as incidents thereto of furnishing water for municipal and domestic use and providing recreation and fish and wildlife benefits, the Secretary of the Interior ... is authorized to construct, operate, and maintain the San Luis unit as an integral part of the Central Valley project.

The San Luis Contractors contend that, inasmuch as the Act's "principal purpose" is to furnish water for the San Luis Unit's service area, the Bureau cannot allocate water from the Reservoir to those outside the service area (such as the Exchange contractors) if such a diversion is to the exclusion or detriment of those contractors within the original service area (such as Westlands) or those within the counties targeted in the Act for future CVP service (such as San Benito). The Bureau and intervenors, of course, point to the language of § 1(a) providing that the San Luis Unit shall be operated and maintained "as an integral part of the Central Valley project."

■ We agree with the district court that § 1(a) of the Act does not compel the Bureau to satisfy the water needs of the San Luis Contractors before diverting water to the Exchange contractors. At the outset we note that the "principal purpose" language of § 1(a), standing alone, does not apply to San Benito, since San Benito is not within the original "San Luis unit service area" defined by § 1(a) at the time of enactment.

The strongest argument in favor of the Bureau is that the Act nowhere mandates that the Reservoir first be used to satisfy the needs of the San Luis Contractors before any diversion to other contractors is allowed. Creating a preference in favor of the San Luis Contractors and others similarly situated, or providing that Reservoir water is for their exclusive benefit, would have been a simple enough drafting exercise for Congress. In effect, the San Luis Contractors ask us to add an important substantive provision to the Act. Such a provision cannot be found in the plain language of the Act, and indeed would be inconsistent with the mandate that the San Luis Unit be operated as an integral part of the whole CVP.

■ Deference to the Bureau's interpretation of the Act is appropriate here. While courts are the final authority on statutory construction, an agency's construction of a statute it is charged with implementing is entitled to deference. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984). As explained in *Washington State Dept. of Game v. ICC,* 829 F.2d 877, 879 (9th Cir.1987):

> Our review of the construction given by an agency to a statute it administers is limited and deferential.... If ... the statute does not address the specific issue before the court, or does so ambiguously, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." Accordingly, the construction adopted need not be the only possible construction or the construction we would have embraced if we had examined the matter *de novo*. Indeed, it need only be "reasonable."

*Id.* at 879 (citations omitted). The Bureau's position—that the Act allows occasional diversions of water from the Reservoir to serve contractors outside of the San Luis Unit's primary service area, so as to serve the overall needs of the CVP—is a reasonable construction of the Act. Furthermore, judicial deference to an agency's construction of a statute "is particularly important where, as here, Congress has vested broad discretion in an agency to interpret a statute...." *National Medical Enters., Inc. v. Sullivan,* 916 F.2d 542, 546 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2014, 114 L.Ed.2d 100 (1991). Here, the Act authorizes over $290 million in initial funding to the Secretary of Interior for the construction of numerous facilities, and the Act provides that "[i]n constructing, operating, and maintaining the San Luis unit, the Secretary shall be governed by the Federal reclamation laws (Act of June 17, 1902 (32 Stat. 388), and Acts amendatory thereof or supplementary thereto)." Act at §§ 1(a), 8. The Reclamation Act of 1902 grants the Secretary of Interior broad authority "to perform any and all acts and to make such rules and regulations as may be necessary and proper for the purpose of carrying the provisions of this Act into full force and effect." 43 U.S.C. § 373.

Both sides claim support from the legislative history of the Act, which the district court reviewed carefully. *Westlands,* 805 F.Supp. at 1509–11. We conclude that the legislative history does not compel a result either way in this case. There is evidence, however, in the legislative history that the

Department of Interior intended to use Reservoir water to serve customers outside the San Luis Unit service area in times of drought, and that Congress was on notice of such an intent. A letter from the Department to the congressional committees considering the legislation, which appears in both the House and Senate Reports, states:

> The primary purpose of the unit, which would be integrated both physically and financially with the overall Central Valley project, is the preservation and expansion of irrigation in the unit area through the importation of water from the Sacramento–San Joaquin Delta.... The plan proposed would utilize off-season capacity of the existing Tracy pumping plant and Delta–Mendota Canal to deliver surplus Delta water to the proposed San Luis pumping plant forebay. From there the water would be pumped for storage into the proposed ... San Luis Reservoir and for later delivery to the lands to be served. (It may be noted, in addition, that our plans call for the release of water from San Luis Reservoir to meet part of the demands in the Delta–Mendota Canal area in critical dry years when shortages would be shared by all Central Valley project water users.)

H.Rep. No. 2682, 85th Cong., 2d Sess. 14 (1958); S.Rep. No. 2202, 85th Cong., 2d Sess. 23 (1958). The Bureau also prepared a feasibility report for the San Luis Unit which both sides agree was submitted to Congress prior to the passage of the Act. The report states:

> In addition to regulating surplus flows, which are within the delivery capacity of the Delta–Mendota Canal, San Luis Reservoir provides added flexibility to the system. This is accomplished by transferring stored water from Shasta and Folsom Reservoirs to San Luis during periods when according to historical runoff characteristics, the water would likely be lost by spilling if retained in Shasta or Folsom. If necessary, the water thus transferred can be released from San Luis Reservoir to meet San Joaquin Valley demands normally met by Shasta and Folsom releases.

Bureau of Reclamation, U.S. Dept. of Interior, *San Luis Unit, Central Valley Project: Report on the Feasibility of Water Supply Development* 47 (1955).

█ These documents are of some importance for two reasons. First, they demonstrate that Congress was on notice of the Bureau's interpretation of its authority under the statute to use Reservoir waters outside of the primary service area. Presumably, if Congress had wanted to give preferential treatment to contractors in the primary service area it could have clarified that intent after receiving the letter and feasibility report. Second, deference to an agency's construction of a statute is especially warranted in the case of a contemporaneous construction by an agency responsible for implementing the legislation. *Alaska Fish & Wildlife Fed'n v. Dunkle*, 829 F.2d 933, 944 (9th Cir.1987), *cert. denied*, 485 U.S. 988, 108 S.Ct. 1290, 99 L.Ed.2d 501 (1988).

The San Luis Contractors argue that two other sections of the Act also support their claim of superior rights to Reservoir waters. They point to § 5 of the Act, which authorizes the Bureau to permit "other parties" to use the drainage and irrigation facilities of the San Luis Unit, and authorizes the Bureau to construct and operate "drainage facilities designed to serve the general area of which the lands to be served by the San Luis unit are a part...." They also point to § 6 of the Act, which requires the Bureau to plan its initial construction with future expansion in mind, but further requires a new congressional authorization before the Bureau may commence additional construction to serve Santa Clara, San Benito, Santa Cruz, and Monterey Counties. They argue that since Congress expressly authorized use of drainage and irrigation facilities by outsiders, and authorized further expansion only upon future congressional approval, then Congress, by negative implication, denied authority to the Bureau to share Reservoir waters with outsiders such as the Exchange contractors. Appellants' apparent resort to the maxim of *inclusio unius est exclusio alterius* is simply too thin a reed on which to hang their statutory construction argument. Sections 5 and 6 do not address the allowed uses of Reservoir waters; § 1 provides that the San Luis project is to be operated as an integral part

of the CVP, and Congress could easily have mandated that Reservoir waters were to serve only one geographic area if such was its desire. The agency responsible for implementing the Act, both at the time of its passage and at the time of the events giving rise to this suit, did not interpret the Act in the manner urged by the San Luis Contractors. In addition, as to § 6 of the Act, it is perfectly understandable that Congress would require additional funding authorization before the Bureau began construction of extensive additions to the San Luis facilities.

## B. *Contract Claims*

In addition to their statutory claims, the San Luis Contractors sought relief based on alleged violations of the Exchange, Westlands and San Benito contracts. The Bureau argues that these claims are subject to the defense of sovereign immunity, and all appellees argue that the contract claims are meritless in any event.

### 1. *Sovereign Immunity*

■■■ The sovereign immunity defense is raised for the first time on appeal. Issues not raised in the district court generally cannot be asserted on appeal. *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 515 (9th Cir.1992). However, we have noted that sovereign immunity is jurisdictional in nature.[2] An appellate court may consider subject matter jurisdiction, on its own motion or at the behest of a party, even if it is not raised in the district court. *Csibi v. Fustos*, 670 F.2d 134, 136 n. 3 (9th Cir.1982); *Smith v. Grimm*, 534 F.2d 1346, 1349 n. 4 (9th Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976).

■■■ The Bureau argues that the Government has not waived sovereign immunity from suits seeking equitable relief based on a breach of contract. A waiver of sovereign

immunity must be unequivocally expressed in statutory text. *United States v. Idaho,* —— U.S. ——, ——, 113 S.Ct. 1893, 1896, 123 L.Ed.2d 563 (1993).

Generally, *contract* claims seeking *money damages* can be brought against the United States, since the Tucker Act waives sovereign immunity on such claims. 28 U.S.C. §§ 1346(a)(2) (West Supp.1993), 1491(a)(1) (West Supp.1993). However, the Tucker Act generally does not authorize injunctive or declaratory relief, as is requested here.[3] *North Side Lumber Co. v. Block,* 753 F.2d 1482, 1485 (9th Cir.), *cert. denied,* 474 U.S. 931, 106 S.Ct. 265, 88 L.Ed.2d 271 (1985). Conversely, the APA generally waives sovereign immunity from nonmonetary claims against federal agencies. The APA authorizes a court to either compel or set aside agency action (i.e. to award equitable relief) but does not authorize money damages. 5 U.S.C. § 706.

The Bureau contends that a *contract* claim seeking *equitable* relief is still subject to the sovereign immunity defense. In *Block,* we held that a suit against the Government seeking equitable relief was partially barred. There, plaintiffs had sought equitable relief from certain timber cutting contracts with the United States. Plaintiffs asserted that performance of the contracts would violate a federal timber statute, and that performance was subject to certain common-law defenses such as impossibility of performance. We held that the claim based on an alleged statutory violation could proceed, but that the common-law claims founded purely on a contract could be brought under neither the Tucker Act nor the APA. *Block,* 753 F.2d at 1484–86.

■■■ In the absence of any other relevant statute, we might hold that sovereign immunity bars appellants' contract claims. How-

---

**2.** *See, e.g., Rivera v. United States,* 924 F.2d 948, 951 (9th Cir.1991) ("The courts lack subject matter jurisdiction to hear constitutional damage claims against the United States, because the United States has not waived sovereign immunity with respect to such claims."); *McCarthy v. United States,* 850 F.2d 558, 560 (9th Cir.1988) ("The question whether the United States has waived its sovereign immunity against suits for damages

is, in the first instance, a question of subject matter jurisdiction."), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989).

**3.** The Tucker Act does provide for nonmonetary relief by the Court of Claims in certain circumstances not present here. 28 U.S.C. §§ 1491(a)(2)–(3) (West.Supp.1993).

ever, § 221 of the Reclamation Reform Act of 1982 provides:

Consent is given to join the United States as a necessary party defendant in any suit to adjudicate, confirm, validate, or decree the contractual rights of a contracting entity and the United States regarding any contract executed pursuant to Federal reclamation law. The United States, when a party to any suit, shall be deemed to have waived any right to plead that it is not amenable thereto by reason of its sovereignty, and shall be subject to judgments, orders, and decrees of the court having jurisdiction, and may obtain review thereof, in the same manner and to the same extent as a private individual under like circumstances.

43 U.S.C. § 390uu. We conclude that this statutory provision waives sovereign immunity in this case, where appellants are seeking injunctive and declaratory relief under the Westlands and San Benito contracts. *Accord Sumner Peck Ranch, Inc. v. Bureau of Reclamation,* 823 F.Supp. 715, 748 (E.D.Cal. 1993) (holding that § 390uu waives sovereign immunity from contract claims for injunctive relief and specific performance).

### 2. *Merits of Contract Claims*

█ The San Luis Contractors alleged that the diversion of Reservoir water to the Exchange contractors is contrary to the Bureau's obligation to satisfy its contractual obligations to the Exchange contractors by releasing water from Millerton Lake in the event the Bureau is unable to deliver a substitute supply. We find no merit to this claim. Article 5 of the Exchange Contract provides that "[i]t is anticipated that most if not all of the substitute water provided the Contracting Entities hereunder will be delivered to them via the aforementioned Delta–Mendota Canal." Article 4 of the Exchange Contract provides that if the Bureau is unable to provide "substitute water from the Delta–Mendota Canal or other sources" it will make releases from Millerton Lake, and Article 3 defines "substitute water" as "all water delivered hereunder at the points of delivery hereinafter specified to the Contracting Entities, regardless of source." The Bureau planned to release Reservoir water

back into the Delta–Mendota Canal to meet its obligations to the Exchange contractors. Such a plan is not prohibited by the Exchange Contract, and is indeed entirely consistent with its provisions.

The complaint also asserts that the Bureau's plan to provide Reservoir water to the Exchange contractors violates the Westlands and San Benito contracts. Specifically, the complaint alleges that "the Bureau's satisfaction of its contractual obligations in water year 1992 to the Exchange contractors through use of water stored in the San Luis Reservoir does not conform to the method of allocation of water during a shortage as required by" Article 11 of the Westlands contract and Article 7(b) of the San Benito contract. The complaint also alleges that the Westlands and San Benito contracts gave Appellant vested rights to water from the Reservoir and the San Luis Unit.

Article 11 of the Westlands contract states:

In any year in which there may occur a shortage from any cause, the United States reserves the right to apportion the available water supply among the District and others entitled under the then existing contracts to receive water from the San Luis Unit in accordance with conclusive determinations of the [Bureau's] Contracting Officer as follows: ....

Article 11 then goes on to set out a formula for allocating water based on the total contractual commitments and total available water for the entire CVP.

Article 7(b) of the San Benito contract states:

In any year that the Contracting Officer determines there is a shortage in the quantity of water available to customers of the United States from the [Central Valley] Project, the Contracting Officer will apportion available water among the water users capable of receiving water from the same Project facilities by reducing deliveries to all such water users by the same percentage, unless he is prohibited by existing contracts, Project authorizations, or he determines that some other method of apportionment is required to prevent undue hardship.

The district court reasoned that the Westlands contract was not violated because, by its own terms, apportionment occurs only at the option of the Bureau which "reserves the right to apportion" and hence is not required to make any apportionment, and because the Bureau's determinations are "conclusive." 805 F.Supp. at 1512. This analysis standing alone does not dispose of the allegation in the complaint that the Bureau's actions were arbitrary and capricious, and hence in violation of the APA.[4] The court went on, however, to conclude that "[t]he Bureau cannot be faulted for honoring its legal commitments to holders of senior water rights," *id.* at 1513, namely the Exchange contractors. The court similarly found no violation of the San Benito contract, since it provides that apportionment is not required if the Bureau is "prohibited by existing contracts," and the court found that the Exchange contractors held senior water rights under an existing contract. *Id.* at 1512. The district court's decision appears to rest therefore on its determination that the Exchange contractors had water rights senior to the San Luis Contractors under California law,[5] and that "the contracts and applicable law establish that the Bureau has the authority to divert water from the San Luis Reservoir to fulfill its contractual obligations to holders of senior water rights within the Central Valley Project." *Westlands*, 805 F.Supp. at 1507.

We are not convinced that the Exchange contractors hold rights to Reservoir water which are superior to the rights of the San Luis Contractors. It is true that some California cases recognize general doctrines of "first in time, first in right" or "prior appropriation." *See, e.g., State Water Resources Control Bd. v. United States*, 44 Cal.3d 448, 454 n. 2, 243 Cal.Rptr. 887, 889 n. 2, 749 P.2d 324, 325 n. 2 ("Under the prior appropriation doctrine, a person who diverts or appropriates water from a watercourse and puts it to a reasonable and beneficial use acquires a right to that use which is superior to the rights of later appropriators."), *cert. denied*, 488 U.S. 824, 109 S.Ct. 71, 102 L.Ed.2d 48 (1988); *Wishon v. Globe Light and Power Co.*, 158 Cal. 137, 140, 110 P. 290, 292 (1910) ("[A]s between appropriators the one first in time is the first in right....") (citation omitted). However, these cases do not clearly decide the issue here. The Exchange contractors took water from the San Joaquin River prior to the construction of the Friant Dam. The Exchange Contract clearly gives them a *contractual* right to substitute water from the Delta–Mendota Canal or other sources. The Delta–Mendota Canal, however, takes water from the Delta, and the Reservoir stores off-season water from the Delta which would otherwise wash into the sea. The Reservoir did not even exist at the time of the execution of the Exchange Contract. Article 4 of the Exchange Contract requires the Government to give notice to future parties contracting for use of San Joaquin River water of the prior rights of the Exchange contractors, but does not recognize the prior rights of the Exchange contractors to water from other sources. Unlike the district court, we are not convinced that the Exchange contractors, prior appropriators of water from one river, have superior water rights (i.e. vested property rights) to water from a different source. We need not resolve this issue of California water law, for the reasons explained below, but write only to express our doubts as to the correctness of the district court's writing on this issue, which may arise in a future case. We also disagree with the district court that the San Benito contract's apportionment provision

---

4. The APA aside, the Westlands contract itself provides at Article 31(d) that "[w]here the terms of this contract provide for ... action to be based upon the ... conclusive determination of ... a representative of either party hereto, such terms are not intended to be and shall never be construed as permitting such ... determination ... to be arbitrary, capricious, or unreasonable; and the District, notwithstanding any other provisions of the contract, expressly reserves the right to relief from ... any such arbitrary, capricious, or unreasonable ... determination."

5. The district court reasoned that, since § 1(a) of the Act provides that the Bureau shall be governed by the Federal reclamation laws, and the Reclamation Act of 1902 in particular, the Bureau must operate in accordance with state water law. 805 F.Supp. at 1509. The district court was correct in concluding that under § 8 of the 1902 Act, 43 U.S.C. § 383, the Government must "defer to the substance, as well as the form, of state water law." *California v. United States*, 438 U.S. 645, 98 S.Ct. 2985, 3001, 57 L.Ed.2d 1018 (1978).

was inapplicable as a matter of law. Even if the district court was correct in ruling that the Exchange contractors had water rights senior to the San Luis Contractors, the San Benito contract provides that apportionment is not required when doing so is *"prohibited by existing contracts."* Appellees did not establish as a matter of law that the Bureau had to divert Reservoir water to meet its contractual obligations to the Exchange contractors. One possibility is that the Bureau could have met those obligations by releasing water from Millerton Lake, as the Exchange Contract expressly contemplates. The pleadings alone do not resolve this issue.

Ultimately, however, we conclude that the district court did not err in dismissing the contract claims. It is important to note that the relief requested by the San Luis Contractors was an injunction prohibiting the release of any Reservoir water to the Exchange contractors, and a declaratory judgment that the Bureau cannot use any Reservoir water to satisfy its obligations to the Exchange contractors, since "Plaintiffs have prior rights to the water stored in the San Luis Reservoir...." After the complaint was filed, the issue arose as to whether the San Luis Contractors contended that Reservoir water could never be used by the Exchange contractors and others outside the San Luis Unit service area, even in times of abundance. The San Luis Contractors did not move to amend their complaint, and clarified their position in responding to the motion for judgment on the pleadings as follows:

> Rather, [the San Luis Contractors] contend that pursuant to provisions of the San Luis Act and the Districts' contracts, the Bureau cannot redivert water stored in the San Luis Reservoir to satisfy its obligation to the Exchange Contractors to the exclusion *or detriment* of the Districts. Rediversion of water from San Luis Reservoir to entities with entitlements to water from the Delta–Mendota Canal is incidental to the principal purpose of the San Luis Act, and is permissible *only* after the Bureau

has complied with the mandate of the Act, furnishing irrigation water to the San Luis Unit service area. In the event inadequate water is stored in San Luis Reservoir to satisfy said obligation, water must be apportioned *among contractors with rights to water from the San Luis Unit.*[6]

(Emphasis added).

In short, the San Luis Contractors maintained their position that, at least during times of a shortage, they were entitled under their contracts and the Act to receive their contractual allotments of Reservoir water before any water could be diverted to the Exchange contractors, and that any apportionment of Reservoir water was to be shared only by the San Luis Contractors and others within the primary service area. Their contract allegations are based on the claim that they are entitled to preferential access to Reservoir waters. They did not allege, even in the alternative, that they are entitled to share Reservoir water with the Exchange contractors on an equal or pro rata basis. As explained above, we reject the argument that the Act mandates preferential treatment of the San Luis Contractors. Likewise, the Westlands and San Benito contracts contain no such requirements. Neither the Act nor the Westlands contract prohibits the Bureau from using Reservoir water to meet its contractual obligations to the Exchange contractors, and the Exchange contractors are therefore "entitled under the then existing contracts to receive water from the San Luis Unit" under Article 11 of the Westlands contract. Likewise, the Exchange contractors are "capable of receiving water from the same Project facilities" under Article 7(b) of the San Benito contract, whether "same Project facilities" is defined as the San Luis Unit or the whole CVP, since Reservoir water can be returned to the Delta–Mendota Canal. Accordingly, we find no error in dismissing the contract claims.

## C. *Other Claims*

The San Luis Contractors complain that the district court erred in upholding the Bu-

---

**6.** The San Luis Contractors continue to insist on appeal (in their reply brief) that "water stored in the Reservoir may not be used for the benefit of non-San Luis Unit contractors to the exclusion or prejudice of San Luis Unit contractors....

Appellants' contention is that the Bureau's authority to use water stored in the Reservoir for the benefit of those outside the federal San Luis Unit service area is limited to water surplus to the needs of the San Luis Unit contractors...."

reau's action without reviewing the full administrative record before the Bureau at the time of its water allocation decision. Section 706 of the APA requires only that the district court review the whole record or "those parts of it cited by a party. . . ." 5 U.S.C. § 706. This case can be resolved by reviewing the pleadings, and the relevant statutes, legislative history and contracts in issue. The San Luis Contractors never complained prior to the district court's decision that the administrative record before the court was inadequate to determine the motions then pending.[7] The district court noted that the parties stipulated to the authenticity of the contracts. *Westlands,* 805 F.Supp. at 1506 n. 8. We therefore find no error.

 The San Luis Contractors finally complain that the district court erred in denying them leave to amend their complaint. They argue that they should have been allowed to assert contractual violations other than those originally asserted in the complaint. Denial of leave to amend is reviewed for abuse of discretion. *Allen v. City of Beverly Hills,* 911 F.2d 367, 373 (9th Cir. 1990). We have held that a district court does not abuse its discretion in denying leave to amend where the movant has presented no new facts but only new theories and has provided no satisfactory explanation for his failure to develop the new contentions originally. *Id.* at 374. Further, we have noted that the district court's discretion is particularly broad where the plaintiff has bypassed

other opportunities to amend. *Mir v. Fosburg,* 646 F.2d 342, 347 (9th Cir.1980). Here appellants filed no motion to amend their complaint and gave no indication of a desire to do so until after the district court rendered its decision. We find no abuse of discretion.

## CONCLUSION

Unlike the district court, we are not convinced that California water law gives the Exchange contractors priority over the San Luis Contractors to Reservoir waters in times of drought. We also do not agree with the district court that, based on the pleadings alone, appellees established as a matter of law that the Bureau was entitled to ignore the water apportionment provisions of the Westlands and San Benito contracts.[8] However, for the reasons explained above, we conclude that the district court's judgment should stand.

AFFIRMED.

---

7. Nor do the San Luis Contractors complain that the district court considered matters outside the pleadings in a manner requiring the motion to dismiss to be treated as a summary judgment motion, as specified in the last sentence of Fed. R.Civ.P. 12(b)(6).

8. At this writing the 1992 water year has expired. In denying the San Luis Contractors' motion for reconsideration, the district court ruled that "[t]o the extent that plaintiffs allege that changes have occurred since the filing of the complaint which potentially affect the Bureau's ability to satisfy its obligations under the water contracts, such as the listing of the Chinook Salmon as an endangered species or passage of the Central Valley Improvement Act, these issues are not part of the present litigation. Dismissal of plaintiffs' complaint in no way bars them from challenging the Bureau's actions based on these, or any, future developments." The Bureau concedes in its appellate brief that "Congress has recently enacted

new legislation concerning the CVP and, in addition, various factors regarding threatened and endangered species might well affect future CVP operations. These changed circumstances insure that if the Secretary should again decide that CVP operations require that water stored in San Luis Reservoir should be used outside of the San Luis Unit and San Felipe Division, the matter will arise under different facts than those which existed when the 1992 allocations were made." We agree, and are of the view that in a future case the San Luis Contractors should not be foreclosed from challenging the Bureau's diversion of Reservoir water on grounds other than those expressly disposed of in this opinion. In particular, we believe that the San Luis Contractors should not be foreclosed from arguing in a future suit that the Bureau has violated its contractual obligations to apportion water as required by the Westlands and San Benito contracts.